Birchard, C. J.
This is a bill filed under section 14 of the chancery act. Swan’s Stat. 703. And the main question to be determined is, whether the complainant has the legal title to the lands in controversy. But to dispose of this, it becomes necessary to examine and settle sundry other points of considerable importance. Among these disputed matters are involved the powers of the Miami Exporting Company, as a banking institution. In ■Clark’s case, 13 Ohio, 1, the right of the Miami Exporting Company to do business as a banking institution was fully examined •and sustained by every member of this court. The dissenting judge going so far as to recognize its banking powers upon a supposed contemporaneous construction of the charter; the state having borrowed from it, deposited with it, and legislated upon it—the judiciary having sustained its rights as a bank. This is •his language:
“The Miami Exporting Company was incorporated in 1803; it immediately assumed the exercise of banking powers, and continued to claim them, and to exercise some of them uninterruptedly the period of thirty-nine years. For a part of that period, its notes constituted the largest portion *of what was called money in the west. The state, more than once, borrowed from it, deposited with it, legislated upon it, and treated it as a bank. The judiciary have, at all times, until now, enforced its rights as a bank, and have placed its affairs in liquidation, under a law applicable to banks only. After this lapse of time, contemporaneous *400 construction, after this course of life, and death, and burial, I find abundant reason to hold it to have proper banking franchises.”
The majority of the court, as well as the learned judge who so ably dissented, held that the Miami Exporting Company had the right to exercise banking powers, but did not feel at liberty, on an inquiry touching their mode and manner of exercising that right, to overlook the step by which it had been acquired. Acting upon the well-settled principle, that a corporation by its charter takes nothing but what is expressly granted, or necessarily incident to the powers expressly granted, they did decide; and we are now enabled to come to the same opinion without a dissent, that the act of incorporation of 1803 contained no grant of banking powers, and that if driven to that, and compelled to rely upon it or upon any construction that the judiciary had ever placed upon it to maintain its franchise, then it could not be sustained.
As to the supposed usage of some of its banking powers, “ uninterruptedly for the period of thirty-nine years,” none of the majority of the court were able to find that fact; the proof did not show it, in that or in any other case that was ever before the court, but, on the contrary, it is a notorious fact, that as a bank the Miami Exporting Company was among those that for many years lay in ruins, dormant, sleeping apparently a perpetual death, and that some new hands, at a very modern period, had seized upon its remains and endeavored to breathe therein the breath of life— making it, so far as usage was concerned, a now creation. There was no such long-continued and uninterrupted usage *as would ripen into a right to take a rate of interest forbidden by statute.
Nor did the court then feel that it was safe for suitors, or their reputation, to decide that the power to bank existed, without any effort to trace the steps by which the company acquired its franchise of banking, or to ascertain when the same was first acquired, and under what restrictions.
This labor was performed, and it resulted, in Clarke’s case, that the court held that the act of 1803 did not confer banking powers, and that the right to exercise them must be claimed under the acts of 1815, and of February 23, 1816, and subject to the provisions of the latter act against unlawful interest.
We 'find no cause to question the views thus,entertained, and if the decision in Paddleford’s case, 8 Ohio, 258, is sound law, we *401 believe that the principles settled in Clark’s case rest upon foundations that can not be shaken. That case settles these propositions :
1. That the Miami Exporting Company was prohibited from taking a greater rate of interest than six per cent, per annum in-advance, on its loans or discounts.
2. That where money was loaned on a contract for more than six per cent, the contract was void for want of power in the corporation to make it.
8. That such contract being prohibited, and against public policy, and void, the law will not raise out of such a transaction an implied promise to repay the money actually loaned.
It was upon this third point, chiefly, that the learned dissenting judge held that case wrongly decided. Yet, we are all of opinion that this point was well decided, and that it was settled in conformity to sound principle, and sustained by authority. I have dwelt more upon Clark’s case than I would, because some of the counsel who have argued this case have seemingly misunderstood, or paid very little attention to that. If we can judge from the arguments they have written, some portions of it must have been entirely ^overlooked. In that case it was found by the jury that the original loan was tainted by the forbidden agreement to pay and receive more than six per cent, interest. The jury were then told that if the original loan was not tainted with usury, the bank might recover for the amount actually loaned on the common money counts, although the subsequent paper given for the renewal of the first notes, was so tainted (p. 19). On reconsideration, we reaffirm this distinction. It is a matter too well settled to need any authority for its support beyond our own.
With those rules for our guide, we are prepared to examine the facts in this case under consideration. The loan of $10,000, made-at Cincinnati, was for six per cent, and no more. There is nothing connected with the case to show that there was any such original agreement as was found in Clark’s case by the jury. As between Comstock and the Miami Exporting Company, the money thus advanced could, under the rule in Clark’s case, have been recovered under the common counts in assumpsit, notwithstanding the extra interest included in the note subsequently given to-' renew the loan. Those new notes only would be void. The debt, would remain, and would constitute a good consideration for a. *402 mew promise ; and the new contract would be binding, if liable to no other objection. The deed of April 23, 1838, was given to ¡secure a bona fide indebtedness. It purports to divest the entire legal title of Comstock in the premises, and to vest the title in the company as trustee. It is not a mortgage, strictly speaking, but a deed of trust. If it took effect at all, it left nothing but an ■equitable right in Comstock, to which a judgment lien could not attach, and which could not be levied upon at law. This deed purports to be given to secure several claims, among them a note of $4,719, discounted at the Conneaut Branch. So far as this last note is-concerned, there is no pretense that it includes any interest that the bank was forbidden to receive. As to this claim, the deed may well stand as a security, if void as to others. The principles of the common law will not require *the avoiding of the entire contract, if any part of it can be sustained. There is no doubt of the power of the Miami Exporting Company to receive and hold a deed in trust for the payment or the security of ,a just debt—one that it could lawfully contract. And although the deed also professes to secure other notes in which an unlawful rate of interest is embraced, it could only be held null as to them. This is a view as fatal to the defendant as though every claim named in the conveyance were without objection, because, as is .above stated, there would remain nothing but an equitable claim to the lands conveyed by Comstock, which could be reached only in a court of equity. But Way has proceeded at law by execution, and has acquired nothing by his purchase. He had not even the naked legal possession of a debtor to levy upon. Complain.ant, in the meantime, under the quitclaim of Comstock, has secured a release of all his equity, and holds now whatever legal • estate was ever vested in the Miami Exporting Company, and that, united with the release of Comstock, vests in Morris both it he entire legal and equitable title to the premises.
Injunction made perpetual.